UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

BP AMERICA INC., ET AL.

VERSUS

STEPHEN CHUSTZ, ET AL.

CIVIL ACTION

NO. 13-620-JJB-SCR

**RULING**

This matter is before the Court on the following motions: (1) the defendants' Motion [rec. doc. 15] to Dismiss for Failure to State a Claim and (2) the plaintiffs' Motion [rec. doc. 24] for Summary Judgment. Both motions are opposed. Rec. docs. 23 & 29. Jurisdiction is based on 28 U.S.C. § 1331. On June 2, 2014, the Court held oral argument regarding these motions. For the reasons provided herein, the Court (1) **GRANTS IN PART and DENIES IN PART** the defendants' Motion [rec. doc. 15] to Dismiss for Failure to State a Claim and (2) **GRANTS IN PART** the plaintiffs' Motion [rec. doc. 24] for Summary Judgment.

**Factual Allegations**

"On April 20, 2010, a loss of control over the Macondo well in Mississippi Canyon Block 252 of the Outer Continental Shelf resulted in an explosion that caused the sinking of the Deepwater Horizon oil rig and an ensuing oil spill." Rec. doc. 1, p. 8, ¶ 20. The spill continued until July 2010, when BP America Inc. and/or its affiliated entities (collectively "BP") installed a capping stack. *Id.* As the well's co-owner, BP acknowledged it was a "responsible party" under the Oil Pollution Act of 1990 ("OPA"), and as a result, it engaged in spill-response activities. Rec. doc. 1, p. 8, ¶ 21. The pending litigation is connected with the clean-up efforts necessitated by the oil spill.

Within days of the explosion on the *Deepwater Horizon*, "a comprehensive response infrastructure took shape under the direction of the Federal On-Scene Coordinator ('FOSC')."

1

Rec. doc. 1, p. 8, ¶ 22. "Through the FOSC, the Unified Command, and the National Incident Command, the United States directed a military-style operation that at its height engaged more than 47,000 individuals, thousands of vessels, and dozens of aircraft." Rec. doc. 1, p. 8, ¶ 23. These "[r]esponse activities and federal supervision continue to this day." *Id.*

Under the Clean Water Act ("CWA"), "[i]f a discharge . . . of oil or a hazardous substance from a vessel, offshore facility, or onshore facility is of such a size or character as to be a substantial threat to the public health or welfare of the United States . . . the President shall direct all Federal, State, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge." 33 U.S.C. § 1321(c)(2)(A). "To prepare for a potential oil spill, the Clean Water Act directs the President to prepare and publish a National Contingency Plan ('NCP')," and during an oil spill, all relevant parties must act in accordance with the NCP or as otherwise directed by the President. Rec. doc. 1, p. 9, ¶ 25 (citing 33 U.S.C. § 1321(c)(3)(A)). In the course of *Deepwater Horizon* clean-up efforts and pursuant to the NCP, the federal government established a "Unified Command" structure that "brought together the federal and state governments, as well as 'responsible parties' (such as BP) under OPA, to take action to counter the spill." Rec. doc. 1, p. 10, ¶ 27. Nonetheless, the Federal On-Scene Coordinator maintained decision-making authority at all times. *Id.*

As part of the spill response, the Unified Command created a Vessels of Opportunity ("VoO") program. Rec. doc. 1, p. 10, ¶ 28. Under the VoO program, BP entered into Master Vessel Charter Agreements with participating vessel owners to assist in the spill-response efforts, including placing oil containment booms along the Gulf of Mexico coastline. Rec. doc. 1, p. 10, ¶ 28; p. 13, ¶ 36. To hold the containment booms in place, VoO participants attached Danforth anchors at intervals along the deployed booms. Rec. doc. 1, p. 11, ¶ 30; p. 13, ¶ 36. On

July 15, 2010, after capping the well, response workers proceeded to collect the containment booms and anchors wherever feasible. Rec. doc. 1, p. 13, ¶ 36. However, as some anchors were lost or buried deep within the sediment, the response workers were unable to collect approximately 1,700 anchors. *See id.*

"In 2010 and 2011, the FOSC directed extensive studies into whether the so-called 'orphan' anchors could be located and recovered." Rec. doc. 1, p. 13, ¶ 37. Advanced magnetometers and sonar could only locate a small percentage of the orphaned anchors, as many of the anchors were buried deep within the sediment. *Id.* In addition, the FOSC "commissioned a federal Net Environmental Benefits Analysis ('NEBA') for the removal of the anchors," which analyzed health risks, environmental risks, and public safety risks potentially resulting from "three possible courses of action: (a) leaving the anchors in place, (b) locating and identifying the anchors, and (c) removing the anchors." Rec. doc. 1, p. 13, ¶ 38. The NEBA's "'Risk Matrix' showed little risk in leaving the anchors in place, while removing them 'show[ed] the highest risk and most dangerous consequences.'" *Id.* (internal citations omitted). Based on this work, the Federal On-Scene Coordinator concluded that she would "disapprove future analysis or removal measures related to potential navigation and environmental hazards purportedly posed by the presence of orphan boom anchors as no further analysis or action [was] warranted." Rec. doc. 2-12, p. 4. The State of Louisiana's Coastal Protection and Restoration Authority objected to this decision, but the FOSC declined to reconsider her determination. Rec. doc. 1, p. 14, ¶ 39.

In 2013, the Louisiana Department of Natural Resources ("LDNR") began making complaints regarding "a boat ramp that allegedly went missing from a vessel operated by one of BP's contractors working on the spill response." Rec. doc. 1, p. 14, ¶ 41. After unsuccessful search efforts, a report was prepared for the FOSC, which concluded that "[b]ased on the

extensive efforts and multiple techniques utilized, additional surveying appears unlikely to locate [the] target ramp." Rec. doc. 1, p. 14, ¶ 41; rec. doc. 2-15, p. 3. The Federal On-Scene Coordinator signed the report acknowledging receipt of the document. Rec. doc. 2-15, p. 2.

Thereafter, the LDNR demanded that BP submit a plan to locate and remove both the anchors and the vessel ramp. Rec. doc. 1, p. 15, ¶ 42. Initially, BP refused to comply and explained "that it was obligated to follow the FOSC's orders." *Id.* As a result, the LDNR issued an August 21 cease and desist order that directed BP to "[s]ubmit a complete and acceptable application for a Coastal Use Permit . . . to remove these encroachments from State waterbottoms, . . . [including] a recovery plan for all abandoned boom anchors and the vessel ramp." Rec. doc. 2-19, p. 5. In addition, the order commanded BP to "[l]ocate and recover all abandoned boom anchors and vessel ramp within 120 days of the approval of the recovery plan." *Id.*

Due to the cease and desist order, the plaintiffs BP America Inc., BP Exploration & Production Inc., and BP Corporations North America Inc. filed the pending lawsuit seeking declaratory and injunctive relief against the LDNR's efforts to force removal of the orphaned anchors. The crux of the plaintiffs' arguments is that the LDNR's cease and desist order is preempted by federal law pursuant to field preemption, impossibility preemption, and obstacle preemption. Specifically, the plaintiffs argue that the FOSC's actions foreclose all future removal efforts. In the course of litigation, the parties filed the pending motions. As these motions are related, the Court will address each in this ruling.

**Analysis**

1. <u>Defendants' Motion to Dismiss for Failure to State a Claim (Rec. Doc. 15)</u>

   a. *Standard of Review*

Initially, the Court will consider the defendants' motion to dismiss. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff." *Davis v. Bellsouth Telecomm.*, 2012 WL 2064699, at *1 (M.D. La. June 7, 2012) (citing *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). The Court does not have to accept as true any legal conclusion contained in the complaint. *Id.* Moreover, the Court can consider documents attached to the complaint or incorporated by reference. *See Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)) ("Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'"). As the plaintiffs attached numerous exhibits to the complaint, the Court will take these documents into consideration in ruling on the motion to dismiss. *See* rec. doc. 2-1 through rec. doc. 2-20.

  b. *Relevant Statutory and Regulatory Background*

As the Clean Water Act provides, "it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United

States, adjoining shorelines, or into or upon the waters of the contiguous zone." 33 U.S.C. § 1321(b)(1). Before the amendments made by the Oil Pollution Act of 1990, "the CWA authorized the President 'to act to remove or arrange for the removal' of discharged oil, 'unless he determines such removal will be done properly by the owner or operator of the vessel, onshore facility, or offshore facility from which the discharge occurs.'" *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, 2012 WL 5960192, at \*6 (E.D. La. Nov. 28, 2012) (citing 33 U.S.C. § 1321(c)(1) (1988), *amended by* OPA, Tit. II, Sec. 2001, Pub. L. No. 101–380, 104 Stat 484, 523–27 (1990)). "In the case of a large discharge of oil that 'created a substantial threat of a pollution hazard to the public health or welfare of the United States' . . . the CWA permitted, but did not require, the federal government to 'coordinate and direct' all public and private response efforts and 'summarily remove, and, if necessary, destroy such vessel by whatever means are available without regard to any provisions of law governing the employment of personnel or the expenditure of appropriated funds.'" *Id.* (citing 33 U.S.C. § 1321(d) (1988)).

In 1990, the "OPA amended the CWA to, among other things, expand federal authority over, and responsibility for, oil spill responses." *Id.* Under the amended provisions, the CWA provides that "[t]he President shall, in accordance with the National Contingency Plan . . . ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil or a hazardous substance . . . ." 33 U.S.C. § 1321(c)(1)(A). In cases of "substantial spills," such as the one resulting from the *Deepwater Horizon* explosion, the CWA provides that "the President **shall direct** all Federal, State, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge." 33 U.S.C. § 1321(c)(2)(A) (emphasis added). "Legislative history states that this provision was 'designed to eliminate the confusion evident in recent spills where the lack of clear delineation of command and

management responsibility impeded prompt and effective response.'" *In re Oil Spill*, 2012 WL 5960192, at *6 (quoting H.R.Rep. No. 101–653, at 45 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 779, 825).

Furthermore, the CWA mandates that the President "prepare and publish a National Contingency Plan for removal of oil and hazardous substances" which "shall provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges, including containment, dispersal, and removal of oil and hazardous substances." 33 U.S.C. § 1321(d). Under the National Contingency Plan, the Federal On-Scene Coordinator "directs response efforts and coordinates all other efforts at the scene of a discharge or release." 40 C.F.R. § 300.120(a). Pursuant to the NCP, "[i]f the discharge results in a substantial threat to the public health or welfare of the United States . . . the [FOSC] must direct all response efforts, as provided in § 300.322(b)." 40 C.F.R. § 300.305(d)(2). This mandates that if "the discharge posses or may present a substantial threat to public health or welfare . . . the [FOSC] shall direct all federal, state, or private actions to remove the discharge or to mitigate or prevent the threat of such a discharge, as appropriate." 40 C.F.R. § 300.305(d)(2); § 300.322(b). Furthermore, in a substantial spill, "[t]he FOSC . . . may take additional response actions not explicitly provided in the NCP." *In re Oil Spill*, 2012 WL 5960192, at *7 (citing 40 C.F.R. § 300.322(c)(3)).

c. *Preemption*

Article VI of the United States Constitution provides that "the laws of the United States . . . shall be the supreme law of the land." U.S. Const. art. VI, cl. 2. "Article VI's Supremacy Clause may entail preemption of state law in any of three ways: by express provision, by implication, or by a conflict between state and federal law." *Louisiana Health Service & Indem. Co. v. Rapides Healthcare System*, 461 F.3d 529, 533 (5th Cir. 2006) (citing *Pac. Gas & Elec.*

*Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-04 (1983)).

Accordingly, "[t]here are three types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption." *Simmons v. Sabine River Authority Louisiana*, 732 F.3d 469, 473 (5th Cir. 2013) (citing *Kurns v. R.R. Friction Prods. Corp.*, 132 S. Ct. 1261, 1265 (2012)). In their complaint, the plaintiffs argue for the applicability of field preemption, impossibility preemption, and obstacle preemption. The Court will address each form of preemption *seriatim*.

### i. Field Preemption

As to their first claim for relief, the plaintiffs aver that "[t]he Clean Water Act expressly reserves to the federal government control over all operations [in] a significant oil spill." Rec. doc. 1, p. 18–19, ¶ 52. The plaintiffs assert that the "LDNR's assertion of jurisdiction encroaches on the field of regulation expressly reserved to the federal government." *Id.* at 54. Specifically, the CWA specifies that the President shall direct all actions to remove a substantial oil spill, and the plaintiffs claim that this "is an express preemption of state laws related to the response to a significant oil spill." Rec. doc. 1, p. 18, ¶ 52. As a result, the plaintiffs aver that "field preemption has the effect of placing the whole area of major oil spill regulation under federal control in a fashion that exists independent of any specific conflicts with state law." Rec. doc. 1, p. 19, ¶ 55.[1]

"[S]tates are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (citing *Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88, 115 (1992)). "The intent to displace state law altogether can be inferred from

---

[1] In the complaint, the plaintiffs acknowledge that any determination regarding field preemption "does not depend on the FOSC's conclusion that the anchors do not threaten navigation or the environment." Rec. doc. 1, p. 19, ¶ 55.

a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Rice*, 331 U.S. at 230). "Although courts should not lightly infer pre-emption [sic], it may be presumed when the federal legislation is 'sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation.'" *International Paper Co. v. Ouellette*, 479 U.S. 481, 491 (1987) (quoting *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713 (1985)) (internal quotation marks omitted).

"Congress intended the . . . [CWA] to 'establish an all-encompassing program of water pollution regulation.'" *Ouellette*, 479 U.S. at 493 (quoting *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 318 (1981)). Nevertheless, both the CWA and the OPA contain multiple savings provisions in relation to oil spill response efforts. *See, e.g.,* 33 U.S.C. § 1321(o), § 2718. While the applicability of these provisions to the present matter is undetermined at this point, "[t]he presence of a savings provision 'is fundamentally incompatible with complete field preemption; if Congress intended to preempt the entire field . . . there would be nothing . . . to 'save,' and the provision would be mere surplusage.'" *Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cir. 2010) (quoting *In re NOS Commc'ns*, 495 F.3d 1052, 1058 (9th Cir. 2007)). *See also Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 338 (3d Cir. 2009); *Time Warner Cable v. Doyle*, 66 F.3d 867, 878 (7th Cir. 1995). Furthermore, courts have recognized that Congress, through the CWA, intended that "there be joint federal/state regulation of ocean waters within three miles of

shore." *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 489 (9th Cir. 1984). Accordingly, the Court finds that the CWA does not establish complete field preemption in the oil-spill-response field, and thus, the plaintiffs failed to state a claim for relief. Therefore, the plaintiffs' field preemption claim must be dismissed pursuant to Rule 12(b)(6).

### ii. Impossibility Preemption

Next, the plaintiffs argue that impossibility preemption applies in the present case. Impossibility preemption, as a subset of conflict preemption in general, occurs in "cases where 'compliance with both federal and state regulations is a physical impossibility.'" *Arizona*, 132 S. Ct. at 2501 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)). "[S]tate and federal law conflict where it is 'impossible for a private party to comply with both state and federal requirements.'" *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2577 (2011) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)). "The question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it." *Id.* at 2579 (citing *Wyeth v. Levine*, 555 U.S. 555, 573 (2009)). "When the 'ordinary meaning' of federal law blocks a private party from independently accomplishing what state law requires without obtaining special approval from the federal government, that party has established [impossibility] preemption." *Cooper v. Wyeth, Inc.*, 2012 WL 733846, at *3 (M.D. La. Mar. 6, 2012) (citing *Mensing*, 131 S. Ct. at 2580).

In their complaint, the plaintiffs argue that "[i]t is simply not possible for BP to comply with the FOSC decisions requiring BP not to remove the uncollected anchors and simultaneously comply with LDNR's directive to remove the anchors, especially because doing so would cause greater environmental damage than leaving them in place." Rec. doc. 1, p. 20, ¶ 60. According to the allegations, "[i]t is impossible for BP to apply for the state Coastal Use Permit mandated in

the [cease and desist] [o]rder while also complying with the stated policy of the FOSC rejecting all 'future analysis or removal measures.'" Rec. doc. 1, p. 21, ¶ 62 (quoting rec. doc. 2-12). Accordingly, the plaintiffs argue that the federal FOSC order effectively forecloses the state LDNR's cease and desist order. Rec. doc. 1, p. 21, ¶ 63.

### 1. Force and Effect of FOSC Determination

At the outset, this Court must determine the force and effect to give to the FOSC's determination to "disapprove future analysis or removal measures related to potential navigation and/or environmental hazards purportedly posed by the presence of orphaned boom anchors." Rec. doc. 2-12, p. 4. In actuality, the United States Coast Guard recommended this course of action to the Federal On-Scene Coordinator in a memorandum dated June 30, 2011, and the FOSC concurred with the recommendation by signing the document on July 1, 2011. The plaintiffs claim that the Federal On-Scene Coordinator's concurrence functions as a prohibition on all future retrieval efforts of orphaned anchors, whereas the defendants contend that no such prohibition results from the FOSC's determination.

The Clean Water Act expressly reserves control over all significant oil spill response operations for the benefit of the federal government. Specifically, the Clean Water Act provides:

> If a discharge, or a substantial threat of a discharge, of oil or a hazardous substance from a vessel, offshore facility, or onshore facility is of such a size or character as to be a substantial threat to the public health or welfare of the United States . . . **the President shall direct all Federal, State, and private actions to remove the discharge** or to mitigate or prevent the threat of the discharge.

33 U.S.C. § 1321(c)(2)(A) (emphasis added). The statute defines "remove" or "removal" as:

> containment and removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches.

33 U.S.C. § 1321(a)(8). Moreover, under the National Contingency Plan established by the President pursuant to the CWA, the Federal On-Scene Coordinator "directs response efforts and coordinates all other efforts at the scene of a discharge or release," and in cases of a substantial spill, "the [FOSC] shall direct all federal, state, or private actions to remove the discharge or to mitigate or prevent the threat of such a discharge, as appropriate." 40 C.F.R. § 300.120(a), § 300.322(b). According to the plaintiffs, "[b]y attempting to 'direct . . . private actions,' . . . [the] LDNR engages in an activity assigned by the CWA to the President alone, and delegable as he sees fit." Rec. doc. 1, p. 19, ¶ 54. The plaintiffs argue that these "encroachments are a textbook case for preemption and must not be permitted." *Id.*

The relevant document is a memorandum from T.D. Lampton, a Gulf Coast Incident Management Team (GCIMT) legal officer, to the Federal On-Scene Coordinator, Captain Julia Hein. Rec. doc. 2-12. The document provides that, after search efforts and a Net Environmental Benefit Analysis, "the response option that would derive the greatest net environmental benefit is that of allowing the anchors to remain in place to degrade via natural processes." *Id.* at p. 3. Allowing the orphaned anchors to remain would "present very minimal physical risk to commercial or recreational fishing activities; and a very minimal risk that they would be a hazard to navigation." *Id.* Additionally, even if the anchors moved due to weather or other events, they would still present a "minimal risk to commercial and recreational vessels." *Id.* at p. 4. Furthermore, "[t]here are no expected human health concerns due to the chemical composition or degradation of the . . . Danforth anchors." *Id.* at p. 3. As a result, the memorandum recommended "that the FOSC disapprove future analysis or removal measures related to potential navigation and/or environmental hazards purportedly posed by the presence of 'orphan' boom anchors as no further analysis or action is warranted." *Id.* The Federal On-Scene Coordinator signed the

document, acknowledging her concurrence with the recommendation. *Id.* Thereafter, the Louisiana Coastal Protection and Restoration Authority "object[ed] to [the Federal On-Scene Coordinator's] decision not to undertake any further analysis or removal measures related to orphaned boom anchors." Rec. doc. 2-13.[2] Nevertheless, despite the "concerns regarding the risks to navigation and to the environment that the orphaned anchors may pose," Captain Julia Hein, the Federal On-Scene Coordinator, stressed that "in the absence of new data supporting the removal of these orphaned anchors, [she] remain[ed] steadfast in [her] decision." *Id.*

The defendants argue that use of language such as "disapproves" signifies that the memorandum affects only matters related to reimbursement from the Oil Spill Liability Trust Fund, as opposed to prohibiting all future removal efforts. *See* 33 C.F.R. §§ 136.203, 136.205. The plaintiffs counter that as a "responsible party," BP cannot recover any removal costs from the Oil Spill Liability Trust Fund, regardless of the Federal On-Scene Coordinator's approval or disapproval. Nevertheless, the defendants offer that because the memorandum does not specifically indicate that it is directed to BP, the "disapproval" could apply to other individuals or entities seeking reimbursement for removing the orphaned anchors.

The Court finds the defendants' argument unavailing. The relevant memorandum does not refer either expressly or obliquely to the Oil Spill Liability Trust Fund. Instead, it specifically mentions the Federal On-Scene Coordinator's obligation under the National Contingency Plan to "direct response efforts and coordinate with federal, state, local and private response agencies." Rec. doc. 2-12, p. 2. Accordingly, a determination that the memorandum applies to reimbursements under the Oil Spill Liability Trust Fund, as the defendants advocate, is unfounded.

---

[2] The plaintiffs attached and incorporated by reference the relevant letter, and therefore, the Court may consider it in rendering its determination. *See Wolcott*, 635 F.3d at 763.

Additionally, the defendants challenge the plaintiffs' characterization that the Federal On-Scene Coordinator "ordered" the plaintiffs not to remove the orphaned anchors.[3] After considering all of the arguments, the Court cannot agree with the defendants' contention. Under the provisions of the CWA, "[t]he President is authorized to delegate the administration . . . to the heads of those Federal departments, agencies, and instrumentalities which he determines to be appropriate." 33 U.S.C. § 1321(l). As such, the President delegated such authority to direct oil-spill response efforts to the Federal On-Scene Coordinator. *See* 40 C.F.R. § 300.120(a) ("The OSC/RPM directs response efforts and coordinates all other efforts at the scene of a discharge or release."). *See also* 40 C.F.R. §§ 300.305(d)(2), 300.322(b). As the Eastern District of Louisiana previously provided:

> The NCP mirrors the CWA's provision regarding federal authority and responsibility. Under the NCP, the Federal On–Scene Coordinator . . . "directs response efforts and coordinates all other efforts at the scene of the discharge or release." When there is a Substantial Spill, "the [F]OSC must direct all response efforts" and "should declare as expeditiously as practicable to spill response participants that the federal government will control the response." The FOSC also may take additional response actions not explicitly provided in the NCP.

*In re Oil Spill*, 2012 WL 5960192, at *7 (internal citations omitted). The "Federal On–Scene Coordinator . . . will direct and coordinate all efforts at the scene of the discharge." *Center for Biological Diversity, Inc. v. BP America Production Co.*, 704 F.3d 413, 418 (5th Cir. 2013). Stated more broadly, "[t]he basic framework for the response management structure is a system (e.g., a unified command system), that brings together the functions of the federal government, the state government, and the responsible party to achieve an effective and efficient response, where the [F]OSC maintains authority." 40 C.F.R. § 300.135(d). Accordingly, the FOSC,

---

[3] The relevant document (rec. doc. 2-12) has been attached to the plaintiffs' original complaint and incorporated by reference, and as such, the Court considered it in making this ruling. *See Wolcott*, 635 F.3d at 763.

through presidential delegation, possesses the authority to direct oil spill response and removal efforts.

In this case, the FOSC concurred with the Coast Guard's recommendation to "disapprove future analysis or removal measures." Rec. doc. 2-12, p. 4. After a request for reconsideration, the FOSC denied the request and reaffirmed her "decision not to undertake any further analysis or removal measures related to orphaned boom anchors." Rec. doc. 2-13, p. 2. In practical terms, if an individual possesses sole authority to direct all efforts engaged in by particular parties, and the directing individual asserts that he or she will disapprove all future activities, that disapproval is a de facto prohibition on all future engagements in the relevant activity. Similarly, the Environmental Protection Agency stated the following while promulgating revisions to the National Contingency Plan:

> EPA disagrees with the . . . view that a state could initiate more stringent measures than the [F]OSC when the latter is directing the response. When directing a response, the [F]OSC is more than managing the response. He or she has specific legal authority to guide the activities of all parties responding to a discharge, and all actions would have to be authorized or approved by the [F]OSC.

59 Fed. Reg. 47,399–400 (Sept. 15, 1994). Because the Federal On-Scene Coordinator, through the President, retains authority to "direct all federal, state, or private actions to remove the discharge or to mitigate or prevent the threat of such a discharge, as appropriate," the Court finds that her disapproval effectively acts as a prohibition on any future removal efforts. 33 U.S.C. § 1321(l); 40 C.F.R. § 300.322(b).

Nonetheless, the defendants contend that even if this prohibition existed previously, it is inapplicable to the present situation as the CWA no longer applies with regards to the anchors. Instead, the defendants argue that this case concerns coastal-zone management, as opposed to oil spill removal and response efforts. However, the CWA gives the President the authority to direct

all actions to remove an oil discharge, and through regulations, that power is delegated to the Federal On-Scene Coordinator. 33 U.S.C. § 1321(c)(2)(A); 40 C.F.R. § 300.322(b). The CWA sets forth a broad definition for "remove" and "removal," which includes "the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches." 33 U.S.C. § 1321(a)(8). Thus, the Federal On-Scene Coordinator's sole authority to direct activities to remove a substantial discharge encompasses a broad range of activities, including all "other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare," and is not limited to physical removal of oil.[4] *Id.*

In support of the disapproval recommendation—which the Federal On-Scene Coordinator adopted—the Coast Guard relied heavily on the Net Environmental Benefit Analysis, which "concluded that the response option that would derive the greatest net environmental benefit is that of allowing the anchors to remain in place to degrade via natural processes." Rec. doc. 2-12, p. 3. More specifically, if the anchors are left in place, they present "no expected human health concerns" and "very minimal physical risk to commercial or recreational fishing activities; and a very minimal risk that they would be a hazard to navigation." *Id.* Thus, the Coast Guard, and the FOSC through her adoption, found that leaving the anchors in place is the best method to "prevent, minimize, or mitigate damage to the public health or welfare." *Id.*; 33 U.S.C. § 1321(a)(8). According to the memorandum, the relevant considerations included environmental concerns, public health concerns, and other relevant concerns. Rec. doc. 2-12. Under the broad definition of "removal" within the CWA, the FOSC's prohibition on future removal based primarily on which course of action derives the greatest net environmental benefit appears to fall

---

[4] For similar reasons, the Court finds that the Coastal Zone Management Act does not apply to the situation at hand, as the relevant field is oil-spill response and removal, as opposed to coastal-zone management.

within the FOSC's authority to direct all actions to remove the discharge. 33 U.S.C. § 1321(a)(8).

Additionally, at the behest of the Federal On-Scene Coordinator, the relevant parties initially deployed these Danforth anchors to hold containment booms in place immediately after the inception of the *Deepwater Horizon* disaster. Rec. doc. 1, p. 11–12. *See also* rec. doc. 2-8, p. 3; *Center for Biological Diversity*, 704 F.3d at 418 ("BP participated in the response activities at the direction of the federal authorities to stop the oil spill."). As these anchors were originally used in oil removal efforts under the authority of the FOSC, the Court finds that the FOSC retains the authority to determine whether parties should engage in future removal efforts to extract those same anchors. *See* 33 U.S.C. § 1321(l); 40 C.F.R. § 300.322(b); *Center for Biological Diversity*, 704 F.3d at 418. The Federal On-Scene Coordinator has not lost the authority to direct all removal efforts, including those related to these anchors, despite the passage of time. *Deepwater Horizon* removal and response efforts continue, and thus, the Federal On-Scene Coordinator retains authority to prohibit the unearthing and removal of these orphaned anchors in order to best protect the environment and public welfare.

As the Court has found that the FOSC prohibited removal efforts regarding the orphaned anchors, the Court must also determine whether the FOSC similarly banned removal efforts regarding the vessel ramp. The plaintiffs provide that the relevant parties undertook search efforts to locate the vessel ramp, and after being unable to pinpoint the ramp's location, the FOSC received a report stating that "[b]ased on the extensive efforts and multiple techniques utilized, additional surveying appears unlikely to locate [the] target ramp." Rec. doc. 1, p. 14, ¶ 41; rec. doc. 2-15, p. 4. The Federal On-Scene Coordinator indicated receipt by signing the

report. Rec. doc. 2-15, p. 4.[5] Nevertheless, in their complaint, the plaintiffs allege that "[t]he FOSC agreed with the report and ordered no further search for the alleged missing ramp." Rec. doc. 1, p. 15. Although on its face this appears to be a factual allegation that this Court must accept as true for purposes of ruling on the defendants' motion to dismiss, it is readily apparent to this Court that the plaintiffs' statement is actually a legal conclusion as to the force and effect of the relevant memorandum.[6] As such, for purposes of ruling on the motion to dismiss, the Court need not accept it as true.

Based on review, the Court finds that the memorandum regarding the vessel ramp does not carry the same legal force and effect as the orphaned-anchor memorandum. First, the vessel-ramp memorandum does not actually provide that the Federal On-Scene Coordinator concurred in the determination that no further efforts to locate the vessel ramp should be undertaken. Instead, the FOSC's signature simply acknowledges receipt of the document. Rec. doc. 2-15, p. 2. Furthermore, the memorandum does not actually provide that the FOSC will or should disapprove/prohibit future efforts to locate and remove the vessel ramp. *See* rec. doc. 2-15. Instead, the memo simply concludes that "[b]ased on the extensive efforts and multiple techniques utilized, additional surveying appears unlikely to locate this target ramp." *Id.* at 4. This does not indicate or imply future prohibition of removal efforts; it is merely an opinion on the potential usefulness of future search efforts. Accordingly, because the memorandum regarding the vessel ramp does not prohibit or indicate the FOSC's disapproval of future efforts to recover the vessel ramp, the plaintiffs failed to show federal action that is made impossible by

---

[5] As the relevant memorandum was attached to the complaint, the Court can consider it in ruling on the motion to dismiss. *See Wolcott*, 635 F.3d at 763.

[6] This is apparent in light of the plaintiffs' statement of undisputed facts attached to their motion for summary judgment, wherein the plaintiffs make the same assertion without any evidentiary reference outside of the exhibit attached to the complaint. *See* rec. doc. 24-3, p. 6, ¶ 20. As a result, it is clear that this allegation in the complaint is a legal conclusion as to the force and effect of the memorandum, as opposed to a factual allegation.

the LDNR's cease and desist order. Accordingly, the plaintiff failed to state a claim of impossibility preemption with regards to the vessel ramp.

## 2. **33 U.S.C. § 2711**

Regardless of the force and effect of the Federal On-Scene Coordinator's prohibition on future removal efforts concerning the orphaned anchors, the defendants argue that the plaintiffs fail to state a claim under impossibility preemption because multiple savings provisions within the OPA and the CWA apply to allow for the LDNR's actions. Both the CWA and the OPA contain multiple savings provisions; however, the issue in this case is whether those provisions actually apply to the present matter in order to save the LDNR's actions from preemption.

The defendants' initial argument is that federal law allows for the imposition of "additional removal activities" beyond what the federal government requires. Their argument is based primarily on the language found within the Oil Pollution Act. Rec. doc. 15-1, p. 7. Pursuant to 33 U.S.C. § 2711:

> The President shall consult with the affected trustees . . . on the appropriate removal action to be taken in connection with any discharge of oil. For the purposes of the National Contingency Plan, removal with respect to any discharge shall be considered completed when so determined by the President in consultation with the Governor or Governors of the affected States. **However, this determination shall not preclude additional removal actions under applicable State law.**

33 U.S.C. § 2711 (emphasis added). The defendants aver that this provision applies to the CWA and reflects the principle that the CWA establishes the minimum standard for environmental protection, and not the requisite maximum. Rec. doc. 15-1, p. 8.

In a recent opinion connected to the *Deepwater Horizon* disaster, the Fifth Circuit looked at the effect of certain savings provisions in relation to both the CWA and the OPA. *See In re Deepwater Horizon*, 745 F.3d 157 (5th Cir. 2014). In dealing with savings provisions within both

acts, the Fifth Circuit provided that "[i]n general, the savings clauses must be read with particularity and, as [*International Paper Co. v.*] *Ouellette* demonstrates, a savings clause does not disrupt the ordinary operation of conflict preemption. *Id.* at 171 (citing *Ouellette*, 479 U.S. 481, 492–92 (1987); *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 869 (2000)). The court went on to provide that the CWA and the OPA should be construed *in pari materia*, as "the OPA was designed to complement, not compete with the CWA." *Id.* at 172. "That the OPA was enacted more recently than the CWA means little where there is no fundamental conflict with provisions of the CWA." *Id.* at 172–73.

In this case, the OPA provision in 33 U.S.C. § 2711 does not appear to save the State's actions. Section 1321(c)(2)(A) provides that the President possesses the sole authority to direct all actions "to remove the discharge or mitigate or prevent the threat of the discharge." Section 2711 provides that when the President determines that the removal is complete, that determination does not preclude additional removal activities under State law. Reading the statutes as they are written, the Court finds that Section 1321(c)(2)(A) bestows the sole authority to direct actions to remove a discharge while those response activities are ongoing onto the President, and Section 2711 only enables states to order additional efforts once the President determines that "removal with respect to any discharge" is complete. 33 U.S.C. § 2711. These statutory provisions are not inherently contradictory, and there is no other justification to find that Section 2711 saves the LDNR's actions regarding the orphaned anchors. As response efforts are ongoing and no presidential determination has occurred, Section 2711 does not apply to save the State's actions in the present matter.

Furthermore, if this Court were to interpret Section 2711 as saving the LDNR's actions in the present matter, "the result would be an implied repeal of CWA preemption." *In re Deepwater*

*Horizon*, 745 F.3d at 173. Specifically, such a finding would nullify the CWA provision conferring sole authority to direct all removal actions in a substantial spill onto the President, because a state would also possess the complete discretion to unilaterally direct additional removal activities at any time it felt necessary. "Implied repeals, however, are disfavored." *Id.* (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 442 (1987); *Ysleta del Sur Pueblo v. Texas*, 36 F.3d 1325, 1335 (5th Cir. 1994)). It would be improper to interpret Section 2711 in such a way as to effectively nullify the specific, unambiguous conference of presidential authority found within Section 1321. Therefore, based on the foregoing reasoning, the Court finds that Section 2711 does not save the LDNR's actions in the present case.

### 3. **33 U.S.C. §§ 2718(a) and (c)**

Next, the defendants argue that 33 U.S.C. §§ 2718(a) and (c) apply to "save" the State's actions from impossibility preemption. Specifically, the defendants contend that these savings clauses contemplate a concurrent state law regime and "expressly allows the State of Louisiana to impose the 'additional requirement' on BP of cleaning up debris it left in Louisiana's coastal waters." Rec. doc. 15-1, p. 13. Yet, the plaintiffs respond that the Fifth Circuit's recent decision in litigation connected to the *Deepwater Horizon* disaster specifies that these OPA savings clauses do not prevent conflict preemption under the CWA.

In that recent Fifth Circuit opinion, the court looked specifically at 33 U.S.C. § 2718(c). This subsection begins with the limiting provision that "[n]othing in this Act . . . shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof." 33 U.S.C. § 2718(c). In its ruling, the Fifth Circuit found that this specific savings provision is inapplicable to the CWA, as it "does not apply beyond the OPA itself and two other laws" that are not at issue in the present matter. *In re Deepwater Horizon*, 745 F.3d at

173; 33 U.S.C. § 2718(c). The court then cited with affirmation to the Supreme Court's holding

in *Ouellette* "that a savings clause commencing with 'nothing in this section' is by its terms

limited to preemption caused by that section alone." *In re Deepwater Horizon*, 745 F.3d at 173

(citing *Ouellette*, 479 U.S. at 493). As the Fifth Circuit stated, "Congress did not refer to the

CWA" in the provision, and as a result, the provision did not save the relevant powers "from the

effects of the CWA or any other non-identified federal law." *Id.*

> Similar to subsection (c), subsection (a) of 33 U.S.C. § 2718 states that:

> **Nothing in this Act** or the Act of March 3, 1851 shall—
> (1) affect, or be construed or interpreted as preempting, the authority of any
> State or political subdivision thereof from imposing any additional
> liability or requirements with respect to—
> (A) the discharge of oil or other pollution by oil within such State;
> or
> (B) any removal activities in connection with such a discharge; or
>
> (2) affect, or be construed or interpreted to affect or modify in any way the
> obligations or liabilities of any person under the Solid Waste Disposal Act
> (42 U.S.C. 6901 et seq.) or State law, including common law.

33 U.S.C. § 2718(a) (emphasis added). Based on the language from the Fifth Circuit decision, it

would appear self-evident that neither subsection would apply to conflict preemption produced

through the CWA—such as is the present case—as the language "this Act" specifically refers to

the OPA.

Nevertheless, the defendants argue that 33 U.S.C. § 1321(c)(2)(A) is part of the OPA,

and thus, falls within the purview of these savings provisions. Rec. doc. 38, p. 5. The defendants

aver that "[t]here is no question that § 2718(c)'s prefatory language 'this Act,' refers to the

Public Law that contains the text for § 1321(c)(2)(A)." *Id.* However, the Court disagrees with

this assertion. Public Law No. 101-380 enacted the OPA, and is accordingly titled the "Oil

Pollution Act of 1990." Additional, Public Law No. 101-380 amended the Federal Water

Pollution Control Act to include the present iteration of 33 U.S.C. § 1321(c)(2)(A), as well as 33 U.S.C. § 1321(b)(6) and (b)(7). Oil Pollution Act of 1990, Pub. L. No. 101-380, § 4201, 104 Stat. 484. In its recent ruling, the Fifth Circuit stated that "the CWA, the fountainhead of clean water regulation, contains the provisions that prohibit oil discharges and set penalties for illegal discharge," including 33 U.S.C. §§ 1321(b)(3), (b)(6), and (b)(7). *In re Deepwater Horizon*, 745 F.3d at 172. Plainly, the Fifth Circuit took it as a fact that Sections 1321(b)(6) and (b)(7) were part of the CWA, despite the fact that the current iteration of these sections was added through Public Law No. 101-380. As the Fifth Circuit found that those provisions were part of the CWA, this Court similarly finds that 33 U.S.C. § 1321(c)(2)(A) is also part of the CWA. Accordingly, the savings provisions in 33 U.S.C. §§ 2718(a) and (c) do not apply to 33 U.S.C. § 1321(c)(2)(A), as the relevant provisions do not apply to "the CWA or any other non-identified federal law." *Id.* at 173.

### 4. **33 U.S.C. § 1370**

The defendants also rely on 33 U.S.C. § 1370, which provides:

> **Except as expressly provided in this chapter**, nothing in this chapter shall . . .
> (2) be construed as impairing or in any manner affecting any right or jurisdiction
> of the States with respect to the waters (including boundary waters) of such
> States.

33 U.S.C. § 1370(2) (emphasis added). The defendants aver that "[u]nder this broad provision, and since there is no 'express' provision to the contrary in the statute, the Clean Water Act does not impair DNR's right to order BP to clean up the anchors and other debris it left in Louisiana's coastal waters." Rec. doc. 15-1, p. 12. However, the Court disagrees with the defendants, as 33 U.S.C. § 1321(c)(2)(A) is a provision that "expressly provides" otherwise. Accordingly, the provisions of 33 U.S.C. § 1370 do not permit the LDNR to order BP to remove the anchors after the FOSC has prohibited such efforts.

5. **33 U.S.C. § 1321(o)**

Finally, the defendants turn to Section 1321(o) in attempt to save their actions. Subsection (o) provides that:

> (1) Nothing in this section shall affect or modify in any way the obligations of any owner or operator of any vessel, or of any owner or operator of any onshore facility or offshore facility to any person or agency under any provision of law for damages to any publicly owned or privately owned property resulting from a discharge of any oil or hazardous substance or from the removal of any such oil or hazardous substance.

> (2) Nothing in this section shall be construed as preempting any State or political subdivision thereof from imposing any requirement or liability with respect to the discharge of oil or hazardous substance into any waters within such State, or with respect to any removal activities related to such discharge.

> (3) Nothing in this section shall be construed as affecting or modifying any other existing authority of any Federal department, agency, or instrumentality, relative to onshore or offshore facilities under this chapter or any other provision of law, or to affect any State or local law not in conflict with this section.

33 U.S.C. § 1321(o).

Turning first to subsection (o)(1), the Court finds that this provision does not apply to save the LDNR's actions at the present time. While the statute states that it does not affect the obligation of certain entities for "damages" resulting from a discharge, the defendants argue that the term "damages" encompasses items other than "money damages," including the actions of the State to force BP to remove the orphaned anchors. The defendants cite to the *United States v. Dixie Carriers, Inc.* case in support of the proposition that "damages" is a broad term. Rec. doc. 29, p. 11. *See also United States v. Dixie Carriers, Inc.*, 462 F. Supp. 1126 (E.D. La. 1978).

When looking at this provision in its recent decision, the Fifth Circuit stated that "Section 1321(o)(1) expressly saves damage claims, not penalties under the Wildlife Statute." *In re Deepwater Horizon*, 745 F.3d at 172. The statute provides that nothing in Section 1321 shall

affect the obligation of an owner or operator "for **damage** to any publicly owned or privately owned property resulting from a discharge of any oil or hazardous substance or from the removal of any such oil or hazardous substance." 33 U.S.C. § 1321(o)(1) (emphasis added). Within Section 1321, the term "damage" is used to signify a specific concept, and is not meant as an all-encompassing term. For example, the terms "damages" and "removal costs" are both used within the section to refer to different items. *See* 33 U.S.C. § 1321(c)(4). Additionally, in its decision, the Fifth Circuit stated that "damages" within Section 1321(o)(1) does not even encompass "penalties" under the Wildlife Statute. *In re Deepwater Horizon*, 745 F.3d at 172. Accordingly, the term "damages" does not encompass a broad array of items. Rather, the term is used to apply to a particular concept.

Despite providing a definition for numerous terms, Section 1321 does not define "damages." Nevertheless, Black's Law Dictionary defines "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." Black's Law Dictionary 471 (10th ed. 2014). Based on the use of the term "damages" within the relevant section, the Court finds that this is an accurate definition. As a result, the term "damages" does not encompass the present actions of the LDNR—rendering a cease and desist order—because the activity does not fall within the commonly-understood and prevailing meaning of the term. Furthermore, the Court disagrees with the defendants' contentions regarding the *Dixie Carriers, Inc.* case and finds that it does not buttress the defendants' argument as is claimed. In line with this reasoning, and for reasons further expounded upon in the plaintiffs' briefs (rec. docs. 24-2 & 39), the Court finds that Section 1321(o)(1) does not act to save the LDNR's actions in the present matter.

Next, with regards to subsection (o)(2), the Fifth Circuit provided that the subsection "only saves state laws imposing liability or additional requirements with respect to the 'discharge' of oil 'into any waters within such State.'" *In re Deepwater Horizon*, 745 F.3d at 171. "The provision does not save a state's laws where the discharge did not occur 'within' the state." *Id.* Under the CWA provisions, "'discharge' includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping." 33 U.S.C. § 1321(a)(2). "These gerunds connote active conduct or movement from a point source to a place within the state rather than the mere passive migration or floating of oil into state waters." *In re Deepwater Horizon*, 745 F.3d at 171–72. It is undisputed that the relevant discharge of oil did not occur in the waters of Louisiana, but rather, migrated to the State's waters at a later time. *See id.* at 172. Accordingly, in line with the Fifth Circuit's prior reasoning, this Court finds that 33 U.S.C. § 1321(o)(2) is inapplicable.

Finally, the Fifth Circuit acknowledged that subsection (o)(3) is a "catch-all provision" that "saves state laws *not in conflict* with the section itself." *Id.* "To construe the catch-all harmoniously with Section 1321(o)(2), which is limited to discharges within state waters, and avoid rendering the companion provision superfluous, the catch-all must be similarly limited." *Id.* Thus, as the discharge in this case did not occur in the waters of Louisiana, but rather migrated into those waters at a later date, the savings provision found in Section 1321(o)(3) does not validate the LDNR's actions.

Therefore, after a review of the defendants' arguments and the relevant savings provisions, the Court finds that none of these provisions prevent the applicability of impossibility preemption. The plaintiffs cannot comply with both the FOSC's prohibition of future removal efforts of the orphaned anchors and the LDNR's cease and desist order that commands removal.

Accordingly, based on all of the abovementioned reasoning, the Court finds that the plaintiffs pleaded sufficient facts to state a claim for relief under impossibility preemption, as none of the savings provisions relied upon by the defendants preserve the LDNR's actions against the express grant of presidential authority in Section 1321(c)(2)(A).

### iii. Obstacle Preemption

Finally, the plaintiffs argue that the State's actions are subject to obstacle preemption, another form of conflict preemption. More specifically, the plaintiffs assert that "any efforts to require BP to undertake remedial steps of any kind concerning the uncollected anchors are subject to conflict preemption." Rec. doc. 1, p. 22. Specifically, the plaintiffs' obstacle preemption claim "focuses on the fact that state law . . . is also preempted merely 'if it [even] interferes with the methods by which the federal statute was designed to reach [its] goal." Rec. doc. 1, p. 23, ¶ 68 (quoting *Ouellette*, 479 U.S. at 494). The plaintiffs assert that "a conflict exists between the State's demand that BP take steps to prepare for the removal of the anchors and the FOSC's order 'disapprov[ing] future analysis or removal measures.'" Rec. doc. 1, p. 25, ¶ 73 (citing rec. doc. 2-12). Furthermore, "[a]ny ability for LDNR to require a Coastal Use Permit would contradict congressional intent to create exclusive federal control over all aspects of oil spill response" and "would allow the State to 'interfere[] with the methods by which the federal statute was designed to reach [its] goal.'" Rec. doc. 1, p. 25, ¶ 74 (quoting *Ouellette*, 479 U.S. at 494).

In addition to situations already covered under impossibility preemption, "[c]onflict preemption occurs . . . 'where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Simmons*, 732 F.3d at 473–74. As the Supreme Court previously stated, courts "will find preemption . . . where

'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects . . . ." *Id.* In *Savage v. Jones*, the Supreme Court provided the following with regards to obstacle preemption:

> For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must, of course, be considered, and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.

225 U.S. 501, 533 (1912).

As this case is presently before the Court on a motion to dismiss, the Court must evaluate whether the plaintiffs pleaded sufficient factual allegations to state a claim for relief. The Court finds that, based on the factual allegations contained within the complaint, the plaintiffs have pleaded sufficient facts to state a claim for relief based on obstacle preemption. The LDNR's actions in requiring BP to apply for a Coastal Use Permit with regards to the anchors and vessel ramp would interfere with the authority provided to the President, and delegated to the Federal On-Scene Coordinator, to "direct all Federal, State, and private actions to remove" a substantial spill. 33 U.S.C. § 1321(c)(2)(A). Additionally, in requiring the preparation and publication of the National Contingency Plan, the CWA seeks to "provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges, including containment, dispersal, and removal of oil and hazardous substances." 33 U.S.C. § 1321(d). "[T]he removal of oil and hazardous substances and actions to minimize damage from oil and hazardous substance

discharges shall, to the greatest extent possible, be in accordance with the National Contingency Plan." 33 U.S.C. § 1321(d)(4).

In this case, the plaintiffs issued a cease and desist order pursuant to La. R.S. § 49:214.36, which provides that the Secretary of the LDNR may "issue cease and desist orders against any person found to be in violation of" the coastal use permit requirements. Rec. doc. 2-19, p. 4; La. R.S. § 49:214.36(B). Through the cease and desist order, the LDNR is attempting to force BP to "[s]ubmit a complete and acceptable application for a Coastal Use Permit . . . to remove [any] encroachments from State waterbottoms, [with] a recovery plan for all abandoned boom anchors and the vessel ramp." Rec. doc. 2-19, p. 5. Thus, by using Louisiana's coastal use permit requirements, the actions of the LDNR mandate that BP apply for a coastal use permit with regards to both the anchors and the vessel ramp.

The "OPA amended the CWA to, among other things, expand federal authority over, and responsibility for, oil spill responses." *In re Oil Spill*, 2012 WL 5960192, at *6. The Eastern District provided the following with regard to the CWA:

> For all spills, regardless of size or character, the CWA now requires that "[t]he President shall, in accordance with the National Contingency Plan and any appropriate Area Contingency Plan, ensure effective and immediate removal of a discharge . . . of oil . . . ." In the case of smaller spills, the President may choose from a variety of options when determining how to ensure effective and immediate removal: the President may remove or arrange for the removal of the discharge; direct removal actions; remove or destroy a vessel discharging oil "by whatever means are available"; or simply monitor removal efforts. However, when there is a Substantial Spill, the CWA deletes the option of monitoring removal efforts. Instead, "[t]he President shall direct all Federal, State, and private actions to remove" a Substantial Spill. Legislative history states that this provision was "designed to eliminate the confusion evident in recent spills where the lack of clear delineation of command and management responsibility impeded prompt and effective response." When addressing a Substantial Spill, the President may remove the discharge, arrange for the removal of the discharge, or destroy a discharging vessel, as he could for smaller spills; however, to "facilitate emergency response," the President may perform these actions "without regard to

any other provision of law governing contracting procedures or employment of personnel by the Federal Government."

*Id.* (internal citations omitted).

The Court finds that the State's actions in this case—in ordering the removal of the orphaned anchors and the missing vessel ramp—are preempted by obstacle preemption, as these actions would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" through the CWA and the OPA. *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (internal quotation marks omitted). The CWA provides for a "clear delineation of command and management responsibility," and specifically gives coordination authority in a substantial discharge to the President of the United States. *In re Oil Spill*, 2012 WL 5960192, at *6; 33 U.S.C. § 1321(c)(2)(A). As is his prerogative, the President delegated such authority to the Federal On-Scene Coordinator. *See* 40 C.F.R. § 300.120(a) ("The OSC/RPM directs response efforts and coordinates all other efforts at the scene of a discharge or release."). *See also* 40 C.F.R. § 300.305(d)(2), § 300.322(b). The Court finds that permitting the State to require any party to acquire a coastal use permit for the items utilized in spill response, including the anchors and vessel ramp at issue in the present matter, would impede the accomplishment and realization of the CWA's objective of providing a "clear delineation of command and management." *In re Oil Spill*, 2012 WL 5960192, at *6. In other situations, Louisiana could mandate that the relevant parties obtain a permit prior to deploying such anchors, despite the FOSC's sole authority to direct removal action and her determination that such efforts are necessary. The State would also be allowed to engage in similar actions under different circumstances, such as in regulating other vessels and tools used in clean-up efforts. *See* La. R.S. §§ 40:214.25, 214.30. While in this case, the State is requiring BP to obtain the coastal use permit after the initial deployment of the

anchors and vessel ramp, the Court finds that permitting the State to require such permits under Louisiana law would disrupt the accomplishment of the CWA's objective of providing a clear delineation of command in oil spills, and thus, cannot be sanctioned. This determination potentially differs once removal and response efforts have ceased. Nevertheless, as that is not the case presently before this Court, the Court makes no finding on such.

Additionally, as aforementioned, the Court finds that there are no applicable savings provisions within either the CWA or the OPA. Accordingly, the plaintiffs pleaded sufficient facts to state an obstacle preemption claim as to the State's efforts to enforce its coastal use permitting laws with regards to the anchors and vessel ramp, because doing so would impede in the CWA's attempt to provide for a coordinated and focused response to substantial oil spills.

d. *Section 1983 Claims*

At the end of their motion to dismiss, the defendants seek dismissal of the plaintiffs' Section 1983 claims. Within each claim for relief, the plaintiffs seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202, as well as injunctive relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201. Neither party disputes that BP can obtain a declaratory judgment and injunctive relief pursuant to the Constitution's Supremacy Clause, without also possessing a Section 1983 claim. *See Planned Parenthood of Houston and Southeast Texas v. Sanchez*, 403 F.3d 324, 331 (5th Cir. 2005). The plaintiffs acknowledge that "the only reason why Section 1983 is at all relevant is because of the possibility of attorney's fees." Rec. doc. 24-2, p. 32. However, the Court finds that the plaintiffs are not entitled to make such a claim in the present case. As the Fifth Circuit provided in the *Planned Parenthood of Houston* case, when looking specifically at the availability of attorney's fees under § 1988:

> The availability of attorney's fees under § 1988(b) is expressly limited to actions or proceedings to enforce certain enumerated provisions of federal law, including

§ 1983. The circuit courts that have addressed the issue have held that claims brought under the Supremacy Clause do not support an award of attorney's fees under § 1988. "[P]reemption of state law under the Supremacy Clause—being grounded not on individual rights but instead on considerations of power—will not support an action under § 1983, and will not, therefore, support a claim for attorneys' fees under § 1988." "[F]ederal preemption of local ordinances pursuant to the Supremacy Clause is not actionable under Section 1983. Therefore, there can be no award of attorney's fees under Section 1988." In this case, the district court correctly held that Plaintiffs' Supremacy Clause claim was not actionable under § 1983. It follows that their Supremacy Clause claim, standing alone, would not support an award of attorney's fees under § 1988.

480 F.3d at 738. The plaintiffs' Supremacy Clause claim alone provides neither a Section 1983 action nor the potential for attorney's fees under 42 U.S.C. § 1988.

Nevertheless, the plaintiffs attempt to overcome this by basing their arguments almost entirely on the *Kerr-McGee* case from the Seventh Circuit. *See Kerr–McGee Chemical Corp. v. City of West Chicago*, 914 F.2d 820, 824 (7th Cir. 1990). The plaintiffs assert that because Congress created "an exclusive federal regulatory scheme," they have a federal right that can be enforced through Section 1983. In *Kerr-McGee*, the Seventh Circuit provided that "[i]t would be peculiar to find an intent on the part of Congress to create a comprehensive and exclusive federal scheme to encourage the safe and productive uses of nuclear energy, and yet not find that the preemptive power of that scheme could be enforced in the federal courts as a 'federal right.'" *Id.* at 825.

However, this Court first acknowledges that the Fifth Circuit has not cited to the case in any opinion since the Seventh Circuit rendered *Kerr-McGee* in 1990. Furthermore, the Seventh Circuit Court of Appeals rendered *Kerr-McGee* almost 12 years prior to the Supreme Court's decision in *Gonzaga University v. Doe*. *See* 536 U.S. 273 (2002). As the Fifth Circuit recently provided:

[I]n *Gonzaga University v. Doe*, the Supreme Court elaborated on the appropriate analysis for determining whether a statutory provision gives rise to a federal right.

32

It made clear that nothing "short of an unambiguously conferred right" can support a cause of action under § 1983. Relying in large part on *Blessing*, the *Gonzaga* Court provided several guidelines for determining when a statutory provision "unambiguously" creates a federal right. The statute must be phrased in "explicit rights-creating terms"—"in terms of the persons benefitted." It must clearly confer an "individual entitlement" and have "an unmistakable focus on the benefitted class." A provision does not confer an individual right when it "speak[s] only in terms of institutional policy and practice," or when it has an "aggregate focus" and is "not concerned with whether the needs of any particular person have been satisfied."

*Romano v. Greenstein*, 721 F.3d 373, 378 (5th Cir. 2013). The Court finds that the relevant laws and statutory schemes in the present matter do not satisfy these requirements so as to provide a Section 1983 claim and the concomitant claim for attorney's fees. Accordingly, this Court must dismiss the plaintiffs' Section 1983 claims.

2.  Plaintiffs' Motion for Summary Judgment (Rec. Doc. 24)

    a.  *Standard of Review*

Next, the Court will address the plaintiffs' pending motion for summary judgment. In reality, the parties put forth the same arguments that they used in the motion to dismiss. Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. P. 56(a). The movant must demonstrate that there is no genuine issue of material fact for trial. When the non-moving party has the burden of proof at trial, the movant need only demonstrate that the record lacks sufficient evidentiary support for the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party can do this by showing that the evidence is insufficient to prove the existence of one or more essential elements of the non-moving party's case. *Id.* A party must support its summary judgment position by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. Rule Civ. P. 56(c)(1).

Although the court considers evidence in a light most favorable to the non-moving party, the non-moving party must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-moving party's burden. *Grimes v. Tex. Dep't of Mental Health*, 102 F.3d 137, 139–40 (5th Cir. 1996). Similarly, "[u]nsworn pleadings, memoranda or the like are not . . . competent summary judgment evidence." *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991).

"In a motion for summary judgment, a federal district court is not called upon to make credibility assessments of conflicting evidence." *Melancon v. Ascension Parish*, 823 F. Supp. 401, 404 n.19 (M.D. La. 1993). "To the contrary, all evidence is considered in the light most favorable to the non-movant." *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (quoting *Anderson*, 477 U.S. at 255).

b. *Preemption Claims*

The Court recognizes that the defendants submitted a Rule 56(d) Declaration Regarding Discovery. However, subsequent to submitting the declaration, the defendants filed additional exhibits in support of their opposition. Rec. doc. 35. Furthermore, the Court acknowledges that, in their Rule 56(d) declaration, the defendants identified these submitted items as being sought through subsequent discovery. *See* rec. doc. 29-7, 35. Accordingly, the Court finds that the defendants' actions have mooted the previously-filed Rule 56(d) declaration.

After review, the Court finds that there are no genuine issues of material fact. It cannot be disputed that the Coast Guard issued the relevant memorandum on June 30, 2011, and the FOSC concurred with the recommendation on July 1, 2011, thus barring future removal efforts for the

orphaned anchors. Rec. doc. 2-12. The parties disagree as to the effect of this document, but that is a legal determination for this Court to make and not a factual dispute. As the Court has provided, this memorandum acts as a prohibition on future removal efforts of the orphaned anchors pursuant to the President's authority under 33 U.S.C. § 1321(c)(2)(A) and delegated to the FOSC. 40 C.F.R. § 300.322. Similarly, there is no factual dispute that the FOSC refused to reconsider the decision not to undertake future analysis and removal efforts. Rec. doc. 2-13. Similar to the orphaned anchor memo, the legal effect of the memorandum regarding the vessel ramp is a determination for this Court and not a factual dispute. Rec. doc. 2-15. Finally, there is no factual dispute that the LDNR issued a cease and desist order on August 21, 2013, requiring removal of these orphaned anchors and vessel ramp. Rec. doc. 2-19. Any factual disputes that the defendants attempt to raise have no effect on the Court's determination, and thus, do not raise genuine issues of material fact.

Furthermore, many of the defendants' arguments appear to focus on the accuracy of the FOSC's prohibition on future removal efforts of the orphaned anchors. To buttress the argument, the defendants submitted affidavits and other evidence in an attempt to show that the determination was factually deficient. However, the defendants refused to seek judicial review of the determinations, and such a review is not an issue in the present matter. The Court will not second-guess the FOSC's previous determination. If the State desires to challenge the determination, it has the means to do so by petitioning the FOSC for reconsideration of the determination based on the present evidence that the State possesses. *See* rec. doc. 2-13, p. 2.

As there are no genuine issues of material fact in this case and based on the legal reasoning already provided in this decision, the Court finds that it must grant summary judgment for the plaintiffs on the issues of impossibility and obstacle preemption. The Court finds that the

law supports the plaintiffs' contention regarding the impossibility of complying with both the FOSC prohibition on future efforts to remove the orphaned anchors and the LDNR cease and desist order. Additionally, the LDNR's attempt to use Louisiana's advance-permitting requirement with regards to the vessel ramp and the anchors necessarily impedes the realization of Congress's goal of providing for coordinated response and removal efforts in substantial oil spills. Moreover, none of the provisions found in the CWA or the OPA save the LDNR's present actions from the President's authority to direct all removal activities. *See* 33 U.S.C. § 1321(c)(2)(A). Therefore, consistent with the reasoning in this opinion, the Court grants summary judgment for the plaintiffs on their declaratory judgment and injunctive relief claims based on impossibility and obstacle preemption.

### Conclusion

Therefore, the Court (1) **GRANTS IN PART and DENIES IN PART** the defendants' Motion [rec. doc. 15] to Dismiss for Failure to State a Claim and (2) **GRANTS IN PART** the plaintiffs' Motion [rec. doc. 24] for Summary Judgment. The plaintiffs shall submit a form of judgment to this Court, after receiving opposing counsel's approval as to form, within 14 days of this ruling.

Signed in Baton Rouge, Louisiana, on July 21, 2014.

_____
**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**